UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
HOWARD FREIRE,

               Plaintiff,

  - against -

P.O. JOHN ZAMOT; P.O. ANTHONY JONES;
DETECTIVE JOHN GUTIERREZ; P.O. EDGAR
GOMEZ; SERGEANT SUI LAM; EMT FELIX
MOLDOVAN; EMT WENDY TAPIA; LUIGI
DINOFRIO; GEORGE AGRIANTONIS; AND
THE CITY OF NEW YORK, individually, and in
their official capacity,

               Defendants.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
14-CV-304 (RRM) (LB)

ROSLYNN R. MAUSKOPF, United States District Judge.[1]

      Howard Freire, plaintiff *pro se*, brings this action under 42 U.S.C. § 1983 alleging false arrest, malicious prosecution, excessive force, failure to intervene, deliberate indifference to medical needs, and *Monell* liability, arising out of an incident in which Freire was shot in the back while fleeing from undercover police officers, and ultimately arrested for perpetrating a carjacking. (*See* Second Am. Compl. ("SAC") (Doc. No. 47).) All of the remaining defendants[2] now move for summary judgment. (Mot. for Summ. J. (Doc. No. 83).) For the reasons stated below, the defendants' motion is granted in part and denied in part. All of Friere's claims are dismissed with the exception of his claim for excessive force as against Detective John Zamot, and his deliberate indifference claim as against Sergeant Luigi D'Onofrio.

---

[1] This case was originally assigned to the Honorable Sandra L. Townes. It was reassigned on February 21, 2018.

[2] Freire's claim against Dr. George Agriantonis was dismissed. (Mem. & Order on Mot. to Dismiss (Doc. No. 91).)

## BACKGROUND

The evidence in this record is quite sparse. The testimony consists of a brief affidavit from defendant Zamot, and limited deposition excerpts from plaintiff Freire. Both parties also submit a small number of documentary exhibits, primarily from the police department, the Civilian Complaint Review Board, and Elmhurst Hospital. The facts recited below are undisputed, except where noted.

According to the affidavit of Detective Zamot, on the afternoon of January 19, 2012, Zamot, Detective Edgar Gomez, and Police Officer Anthony Jones were on patrol. (Zamot Aff., Ex. C to Gutmann Decl. in Supp. of Mot. for Summ. J. (Doc. No. 86-3) ¶ 2.) At approximately 1:12 PM, they received a radio run concerning an attempted carjacking at gunpoint in their vicinity that contained a description of the perpetrator. (*Id.* ¶¶ 3–4.) The officers drove to the location where Zamot observed Freire, who matched the physical description of the suspect. (*Id.* ¶¶ 5–6.) The three officers then exited their vehicle and approached Freire, who turned around and fled. (*Id.* ¶ 6.)

To this point, Freire does not dispute the facts set out in Zamot's affidavit. In fact, Freire does not dispute that he attempted a carjacking during which he struck the elderly victim on the hands with a realistic-looking toy gun.[3]

Freire admits that he ran as he was approached by what Freire describes as three men "who weren't dressed like policemen." (Freire Dep., Ex. A to Gutmann Decl. in Supp. of Mot. for Summ. J. (Doc. No. 81-2) at 59.) Freire testified that the men approached him in a

---

[3] In his deposition, Freire testifies to the facts and circumstances leading up to the encounter with the defendant officers, including the details of the attempted carjacking. (Freire Dep., Ex. A to Gutmann Decl. in Supp. of Mot. for Summ. J. (Doc. No. 81-2) at 56–58.) These facts are not relevant to the legal issues here, including whether the officers had probable cause to arrest Freire, as the officers were not aware of them at the time they encountered Freire.

2

"threatening manner," and he believed they were friends of the elderly carjacking victim. (*Id.* at 58–59.) As Freire testified, "I had just beat up the guy and left and then these three guys just show up out of nowhere and begin chasing me, so I put the two together." (*Id.* at 61.) Freire testified that he was afraid of the three men, and he "wasn't going to fight them. It was three against one." (*Id.* at 59.)

Freire confirms that he continued to run and the three men (the officers) continued to chase him. Zamot concludes his own narrative this way:

> While in pursuit, I ordered Mr. Freire to stop, but he did not comply. I believed that there was a strong possibility that Mr. Freire, having already attempted one carjacking at gunpoint, would try once more to attempt a carjacking at gunpoint thus putting other individuals in danger of serious physical harm if he were allowed to escape. I shot plaintiff once.

(Zamot Aff. ¶¶ 8–10.) Nowhere in Zamot's affidavit does he say that he or his fellow officers ever identified themselves as police officers.

In both his deposition and in his affidavit in support of this motion, Freire clearly disputes that the officers ever identified themselves or told him to stop:

> Q: Did the three men ever yell at you to stop or did they say that they were police?
>
> A: No.[4]

(Freire Dep. at 60.) Freire testified that as he was running, he "turned into a driveway to try to jump over a fence. As I turned into the driveway, I was shot in the back." (*Id.* at 60.) Freire testified that he later learned that it was Zamot who shot him, but did not see who did it at the time. (*Id.* at 61.) He estimated that the officers were no more than eight feet away from him when he was shot. (*Id.*)

---

[4] Freire was also asked if he was aware that a witness yelled out "Stop, police," to which Freire testified, "I'm not aware of anyone saying that anyone said Stop, police." (Freire Dep. at 60.)

3

Freire also testified that during the chase, the toy gun was in his waistband, and it fell out only when he hit the ground after being shot. (*Id.* at 63.) Freire testified that he never reached into his waistband, or showed the gun to the officers to scare them off. (*Id.* at 60.) The defendants do not challenge these facts.[5]

After Freire was shot, Sergeant Sui Lam, Detective John Gutierrez, and an ambulance with EMTs Felix Moldovan and Wendy Tapia arrived. (Freire Aff. in Supp. of Opp. (Doc. No. 81-2) ¶¶ 6–7.) The ambulance arrived on the scene at 1:18 PM. (Ambulance Call Report, Ex. D to Gutmann Decl. in Supp. of Mot. for Summ. J. (Doc. No. 86-4) at 1.) Freire's transportation to the hospital was delayed under the instruction of Detective Gutierrez in order to conduct a show-up identification. (Freire Aff. ¶ 7.) The ambulance arrived at the hospital by 1:36 PM. (Elmhurst Hospital Medical Chart, Ex. E to Gutmann Decl. in Supp. of Mot. for Summ. J. (Doc. No. 86-5) at 3.)

The hospital found that the bullet entered on the left side of Freire's lower back and cut through to his left lower anterior abdominal wall. (Pl.'s Opp. Exs. (Doc. No. 81-1) at 1.) Freire underwent major surgery[6] (*id.*) and was discharged on January 25, 2012 (Freire Aff. ¶ 9).

After Freire's release from the hospital into police custody, Sergeant Luigi D'Onofrio denied Freire medication that had been dispensed at the hospital pharmacy. (*Id.* ¶¶ 10–11.)

---

[5] In Civilian Complaint Review Board interview reports appended as exhibits to Freire's motion papers, the officers stated that Freire reached in his waistband as he was running. (Pl.'s Opp. Exs. (Doc. No. 81-1) at 2–4.) Officer Gomez said he could not see what Freire was doing with his hand. (*Id.* at 2.) Officer Jones stated that Freire "continued reaching into his waistband with his right hand as he bladed his body towards the officers" but could not see anything in Freire's hand. (*Id.* at 4.) Zamot stated that believed he saw a gun in Freire's waistband, but was not entirely certain, until "he observed Mr. Freire with his body bladed towards the left, partially facing PO Zamot. Mr. Freire had a gun in his right hand, held low and pointed at PO Zamot." (*Id.* at 3.) Defendants do not rely on these facts to challenge the sworn testimony of Freire, or in any other way. Thus, for purposes of this motion, Freire's statements that the gun was never visible to the officers until it fell out after he was shot must be credited.

[6] Freire underwent an exploratory laparotomy, and the injuries that were discovered required a segmental small bowel resection, segmental sigmoid colon resection, and anastomosis. (Pl.'s Opp. Exs. at 1.)

According to Freire's affidavit, D'Onofrio "held the medications in his hand while taunting [Freire] yet he did not allow anyone to give [Freire] said medications." (*Id.* ¶ 11.) Freire was returned to Elmhurst Hospital on January 26 at approximately 1:30 AM for "severe abdominal pain at the site of the surgery and back pain at the site of the gun shot wound." (*Id.* ¶¶ 10, 13.) Freire was administered one dose of his medication and returned to the precinct. (*Id.* ¶ 13.) Again, upon return to police custody, Freire claims he was denied his prescribed medications and had to be taken back to Elmhurst Hospital later that same day at 3:30 PM for "severe abdominal and back pain." (*Id.* ¶ 14.) The day after that, on January 27, 2012, Freire was again admitted, this time at Jamaica Hospital, for "an abscess, Post intestinal surgery constipation, nausea, abdominal distention," and severe, constant pain in his lower back and abdominal area. (*Id.* ¶ 15.) He spent several days in the hospital "with IV and antibiotics because of the complications." (*Id.* ¶ 16.)

Freire was later convicted of Robbery in the First Degree, and other state crimes stemming from the conduct leading to his arrest. (Certificate of Disposition Indictment, Ex. F to Gutmann Decl. in Supp. of Mot. for Summ. J. (Doc. No. 86-6).) These convictions are now on appeal. (Pl.'s Opp. (Doc. No. 81) at 1.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine

issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

If the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and emphasis omitted). The non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). In other words, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

In this case, the Court is mindful of its obligation to construe *pro se* submissions liberally. *See generally Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted). Essentially, the Court holds *pro se* submissions to a less exacting standard than those drafted by attorneys. *See Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Boykin v. KeyCorp*, 521 F.3d 202, 213–14 (2d Cir. 2008). Since *pro se* submissions "are entitled to a liberal construction," the Court reads them "to raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (internal citations omitted). However, the Court "need not argue

6

a *pro se* litigant's case nor create a case for the *pro se* which does not exist." *Molina v. New York*, 956 F. Supp. 257, 259 (E.D.N.Y. 1995).

In that same vein, the Court has broad discretion to determine whether to overlook a party's failure to comply with the Local Rules, particularly when they appear *pro se*. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Here, Freire did not submit a document styled as a Local Rule 56.1 statement, to which the defendants object; however, Freire did submit an "Affidavit 1" (Freire Aff.) to which the defendants responded (Defs.' Resp. to Freire Aff. (Doc. No. 89)). In any case, the Court may not rely solely on the defendants' Local Rule 56.1 statement of facts. Where the defendants' Local Rule 56.1 statement is not supported by the record, the Court reviews the record *de novo*. *Holtz*, 258 F.3d at 73; *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (the Court "must be satisfied that the citation to evidence in the record supports the assertion"). *Giannullo v. City of N.Y.*, on which the defendants rely, holds similarly. 322 F.3d 139, 140 (2d Cir. 2003).

## DISCUSSION

### I. False Arrest and Malicious Prosecution

A section 1983 claim for false arrest has substantially the same elements as a claim for false arrest under New York law. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A plaintiff alleging false arrest "must show . . . that the defendant intentionally confined him without his consent and without justification." Id. "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (internal quotation and citation omitted).

Moreover, the Second Circuit has adopted "the common-law rule, equally applicable to actions asserting false arrest, false imprisonment, or malicious prosecution . . . that the plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested." *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986). The Second Circuit has explained that "[w]here the civil rights plaintiff has been convicted of the offense for which he was arrested, we have in effect accepted the fact of that conviction as conclusive evidence of the good faith and reasonableness of the officer's belief in the lawfulness of the arrest." *Id*. at 388; *see also Gordon v. City of New York*, No. 10-cv-5148, 2012 U.S. Dist. LEXIS 44251, at *8-9 (same) (E.D.N.Y. Mar. 29, 2012). An examination of the totality of the circumstances known to the officer at the time of arrest is not required if plaintiff is convicted after trial or pleads guilty to the underlying or a lesser charge. *Feurtado v. Gillespie*, No. 04-CV-3405, 2005 U.S. Dist. LEXIS 30310, at *13-14 (E.D.N.Y. Nov. 17, 2005).[7]

Here, Freire's convictions based on the conduct leading to his arrest are undisputed, and because the convictions establish probable cause for his arrest, summary judgment is granted as to his claims for false arrest and malicious prosecution.

## II. Excessive Force

Claims that law enforcement officials have used excessive force during an arrest invoke rights protected by the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent

---

[7] The only exception is where the plaintiff can "prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). A pending appeal does not suffice. *Cruz v. Reiner*, No. 11-CV-2131 (BMC) (SMG), 2011 WL 6204101 (E.D.N.Y. Dec. 12, 2011) (dismissing claims based on conviction that was being challenged).

escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985).

The excessive force inquiry is an objective one, and requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. For the purpose of preventing evasion of arrest, potentially deadly force may only be used 'if *necessary* to prevent escape, and if, where feasible, some warning has been given.'" *Hemphill v. Schott*, 141 F.3d 412, 417 (2d Cir. 1998) (emphasis in original) (internal citations omitted) (citing *Graham*, 490 U.S. at 396, and quoting *Garner*, 471 U.S. at 11–12). "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

Viewing them in the light most favorable to Freire, as the Court must, the sparse facts in this record leave unanswered virtually every question in the excessive force analysis, or create material disputes that cannot be resolved on this motion.

The Court notes at the outset that the officers arguably had probable cause to believe that Freire committed an armed carjacking. Although the defendants do not provide the radio run itself, or any details it contained, according to Zamot's affidavit, the radio run informed the officers that the crime was committed at gunpoint, and provided a description of the perpetrator

which Zamot claimed Freire matched. However, we do not know how detailed the description was, or how closely Freire matched that description. In the absence of more facts, arguably, the officers had some basis to believe that Freire may have committed a serious, violent crime.

But what gave the officers cause to believe that Freire posed a threat of serious physical harm, either to the officers or to others? It is undisputed that Freire never reached for the toy gun in his waistband, and never showed it to the officers at any time during the encounter. The only time the weapon was visible to the officers was after Freire had been shot. Thus, nothing in the record suggests that the officers feared for their own safety.[8] Indeed, the record is to the contrary.

Instead, defendants rely on the threat of serious physical harm to others. As Zamot says in his affidavit, he "believed there was a strong possibility that Mr. Freire having already attempted one carjacking at gunpoint, would try once more to attempt a carjacking at gunpoint." Without more, this hardly provides justification for the use of deadly physical force.

First, as noted above, it is not clear from the record how closely Freire matched the description of the perpetrator. If the description was detailed and Freire matched it to a tee, the officers would have a much stronger basis to believe that Freire might be armed. The record also does not contain much, if anything, to determine how long after – or how far from – the carjacking the officers spotted Freire. This, too, goes to the officer's reasonable belief that Freire might be armed, as a temporal or geographic gap can provide an opportunity for a perpetrator to dispose of his weapon. These gaps in the record are particularly important in light of the fact that Freire plainly testified that he never gave the officers reason to see or suspect he had a gun, toy or otherwise, in his waistband.

---

[8] As noted above, the defendants do not rely on their version of the facts contained in the CCRB interview records that do suggest the officers had reason to believe Freire either possessed – or even pointed – a gun.

10

Moreover, Zamot's "strong possibility" that Freire would commit another carjacking is wholly speculative. The mere fact that an individual committed a violent crime in the past in and of itself is no basis to believe he going to do it again in the immediate future. The officers had no idea why Freire attempted to carjack the elderly victim. Did he know the victim? Was he merely attempting a robbery? Was he trying to make a quick get away from something else, for example, another crime that he just committed? Without knowing more, Zamot's assessment of the risk is nothing more than conjecture. Zamot's reasoning, in effect, swallows much of the *Garner* analysis as it automatically collapses the severity of the crime with the serious risk to others in the case of every perpetrator who commits violent crime.

Zamot's speculative rationale for the serious risk posed is exacerbated by the complete lack of detail regarding the officer's pursuit. There is absolutely nothing in the record about how long they chased Freire, or how far, or where, whether through residential streets, or yards, or commercial buildings. It is only Freire himself who describes how he "turned into a driveway to try to jump over a fence" when Zamot shot him. What did the officers observe that led them to believe he was going over the fence? Where, exactly, was Friere in relation to the fence? (Friere says he was shot as he turned into the driveway.) What risk did Freire pose if he made it to the other side? Could the officers have climbed the fence and continued their pursuit? Did the officers call for back up to go to the other side? How far were the officers when Zamot fired his shot? Freire says it was eight feet. Could the officers have tackled him instead of shooting him? These are but some of the unanswered questions that are critical to the fact-intensive *Garner* analysis. Without answers, the Court cannot say as a matter of law that Zamot was justified in his use of deadly force.

Finally, the *Garner* analysis requires a warning, if feasible. Of course, Zamot says he told Freire to stop; Freire disputes this. On these facts, it is difficult to see, in this case, how a warning would not be feasible, making this a material dispute of fact on an important prong in the analysis. Critically, Zamot does *not* say the officers identified themselves as police officers, and Freire testified that they never did. This also colors Freire's flight, as a reasonable jury crediting Freire's testimony could find that the officers were not justified in concluding that Freire was escaping from the police, but rather from three thugs in street clothes who came to assault him.

All told, on this record, and taking the facts in the light most favorable to Freire, the court cannot find as a matter of law that Freire's shooting was constitutionally permissible. *See Stephenson v. Doe*, 332 F.3d 68 (2d Cir. 2003) (denying defendants' motion at trial for judgment as a matter of law, finding that fact issues bearing on the reasonable use of deadly force by undercover officers remained, including "whether the officers gave warnings and, if so, the sufficiency thereof").[9]

### III. Failure to Intervene

The Court construes Freire's complaint to allege a claim for failure to intervene against Detective Gomez and Police Officer Jones for failing to prevent Detective Zamot from using deadly force. (SAC ¶ 3.) An officer who fails to intervene may be liable for preventable harm caused by the actions of other officers if he or she observes or has reason to know that those

---

[9] Defendants also seek qualified immunity. "The objective reasonableness test is met – and the defendant is entitled to immunity – if officers of reasonable competence could disagree on the legality of the defendant's actions." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (internal citation and quotations omitted). Conversely, the objective reasonableness test will not be met "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded . . . in that moment that his use of deadly force was necessary." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (internal quotation marks and citations omitted) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Given the open questions discussed herein, and for the same reasons, the Court cannot resolve the qualified immunity question as well.

other officers violated a person's constitutional rights. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Liability may attach only when "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)).

To the extent Freire intended to allege such a claim, and even assuming that the use of deadly force here was a constitutional violation, the facts are nonetheless insufficient to survive summary judgment. Namely, Detective Gomez and Officer Jones simply had no opportunity to intervene. Detective Zamot fired a single shot while all three officers were actively in pursuit of Freire on foot. No evidence suggests that any officer issued a warning about the imminent use of deadly force prior to the shot, and there is no allegation of excessive force used after the shot. On these facts, Detective Gomez and Officer Jones had no opportunity to intervene before Detective Zamot fired his weapon.

## IV. Deliberate Indifference to Medical Needs

Where a pre-trial detainee alleges deliberate indifference to a medical need while incarcerated, such a claim is evaluated under the Due Process Clause of the Fourteenth Amendment. *See Arac v. Bodek*, 213 F.3d 625 (2d Cir. 2000) (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244-45, 103 S.Ct. 2979, 77 L. Ed. 2d 605 (1983)). While the exact standard to be applied to such a claim has not been made clear, what is known is that the pre-trial detainee's rights are at least as great as those provided to a convicted prisoner under the Eighth Amendment, *see City of Revere*, 463 U.S. at 244, and that something more than negligence on the part of the defendant is required, *see Bryant v. Maffuci*, 923 F.2d 979, 984 (2d

13

Cir. 1991). Consequently, courts tend to apply the Eighth Amendment standard when deciding a pre-trial detainee's claim for deliberate indifference to a medical need under the Fourteenth Amendment. *See Lloyd v. Lee*, 570 F.Supp.2d 556, 570 (S.D.N.Y. 2008). *See also Lara v. Bloomberg*, No. 04-CV-8690, 2007 U.S. Dist. LEXIS 95635 n.4 (S.D.N.Y. Jan. 8, 2008) (citing *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000)). Accordingly, in order for a pre-trial detainee to establish a claim for deliberate indifference to a medical need, a plaintiff must allege

> (1) a deprivation that is "sufficiently serious," i.e., a deprivation that presents a "condition of urgency, one that may produce death, degeneration, or extreme pain," *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)), and (2) reckless indifference, that is, "defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm." *Singleton v. Perilli*, No. 03 Civ. 2271(DC), 2004 U.S. Dist. LEXIS 501 (S.D.N.Y. Jan. 16, 2004).

*Lloyd*, 570 F.Supp.2d at 566.

Liberally construed, Freire's complaint can be read to allege two claims of deliberate indifference to medical needs: (1) as against Detective Gutierrez, EMT Moldovan, and EMT Tapia, for the delay in being transported to the hospital to conduct a show-up identification; and (2) as against Sergeant D'Onofrio, for withholding prescribed post-operative medication. For the reasons that follow, Freire's claims against Gutierrez, Moldovan and Tapia fail; his claim against D'Onofrio survive.

### a. Delay of Treatment after Gunshot Wound

There can be no doubt that a gunshot wound to Freire's lower back was a "condition of urgency." That said, the only deprivation of care alleged is the delay caused by the show-up identification. Freire's claim fails for two reasons.

First, in total, 18 minutes passed between the ambulance's arrival on the scene and Freire's arrival at the hospital. Crediting Freire's assertion that it would only take five minutes

14

to arrive at the hospital from the scene of the shooting, the Court will assume for the purposes of this motion that the delay was 13 minutes long. Hospital records submitted by both sides indicate that Freire arrived at the hospital in stable condition.[10] Thus, under these circumstances, the delay was not one that presented an urgent condition, particularly given the fact that trained medical officers were on the scene, tending to Freire during this brief period. Second, the officers had a legitimate law enforcement reason to remain at the scene – to confirm his identity as the perpetrator of the attempted carjacking. The brief delay of only a few minutes for this purpose, particularly when Freire's condition was stable, hardly suggests that the officers consciously disregarded a serious risk of substantial harm.

### b. Deliberate Withholding of Prescribed Pain Medication

The Supreme Court has held that deliberate indifference to the serious medical needs of prisoners can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976); *see also Cook v. New York City Dep't of Corr.*, 198 F.3d 233 (2d Cir. 1999) (deliberate indifference can be demonstrated by intentional interference with access to medical care).

In this case, Friere alleges in his affidavit that on January 26, 2012, Sergeant D'Onofrio "held the medications in his hand while taunting me yet he did not allow anyone to give me said medications." Freire describes the extreme pain that he was in, and indeed, following this incident, he was hospitalized twice in two days. Defendants do not controvert these facts. As

---

[10] For example, the defendants submit triage notes indicating that, on arrival, Freire's airway was "open and patent," his breathing was "spontaneous" and "non-labored," his pulse was "strong," and he was "awake and alert with an affect that is calm." (Elmhurst Hospital Medical Chart at 3.) Freire submits an attending admission note, stating that Freire was "hemodynamically stable" and "alert and oriented." (Pl.'s Opp. Exs. at 1.)

15

such, Freire has provided sufficient facts to state a claim against D'Onofrio. *See Robinson v. Knibbs*, No. 16-CV-3826 (NSR), 2017 WL 3578700, at *6 (S.D.N.Y. Aug. 17, 2017) (where officer who knew of prisoner's pain, medical treatment, and prescription nonetheless denied prisoner's prescribed Percocet for a fracture in his foot, "it is reasonable to infer that the harm caused by the denial of pain medication was sufficiently serious in that it perpetuated continuous, significant pain unnecessarily, and led to a needlessly prolonged period of delay in Plaintiff's receipt of medical treatment" and that "subjective prong" of deliberate indifference was satisfied).

### V. *Monell* Liability

A municipality can be liable under § 1983 only if a plaintiff demonstrates that a municipal policy or custom caused the deprivation of his or her constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1741 (2012) ("[T]o establish municipal liability under § 1983, a plaintiff must prove that action pursuant to official municipal policy caused the alleged constitutional injury" (citation and internal quotation marks omitted)). Proof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality without proof that it was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

Here, Freire has not stated any specific facts that suggest the alleged police misconduct was the result of a municipal policy, custom, or practice. Instead, Freire broadly alleges that the City of New York "has a custom of allowing use of excessive force" and has "fail[ed] to develop an adequate training program in the effecting of arrest and the apprehension of a fleeing

16

suspect," and that, together, these "constitute the moving force behind the outrageous and reckless conduct of these officers, as well as deliberate indifference." (Freire Aff. ¶¶ 18–19.)

Freire's allegations of isolated instances of unconstitutional activity, in combination with these conclusory statements, are insufficient to impose liability on the City. As such, the defendants' motion for summary judgment as to claims against the City of New York is granted.

## CONCLUSION

For the reasons stated above, the defendants' summary judgment motion is granted in part and denied in part. Specifically, Freire's claims for false arrest, malicious prosecution, failure to intervene, and municipal liability are dismissed. Freire's claim of deliberate indifference to medical needs as against Detective Gutierrez, EMT Moldovan, and EMT Tapia is likewise dismissed. Freire's claim of excessive force as against Detective Zamot, and his claim of deliberate indifference to medical needs as against Sergeant D'Onofrio, survive.

The City is ordered to serve a copy of this Memorandum and Order on Freire within ten days of the date of this order, and file proof of service with the Court forthwith upon so doing.

This case is recommitted to the assigned magistrate judge for all remaining pre-trial proceedings.

SO ORDERED.

Dated: Brooklyn, New York
       March 30, 2018

*Roslynn R. Mauskopf*

ROSLYNN R. MAUSKOPF
United States District Judge